IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| ORBITAL ATK, INC., SPACE LOGISTICS LLC, | ) ) ) | |
| Plaintiffs | ) ) | 1:17-cv-163 (LMB/IDD) |
| v. | ) ) | |
| DR. STEVEN H. WALKER, in his official Capacity as Acting Director of the Defense Advanced Research Project Agency, the DEFENSE ADVANCED RESEARCH PROJECTS AGENCY, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiffs, Orbital ATK and its subsidiary, Space Logistics LLC, have brought suit against the Defense Advanced Research Projects Agency and its acting director, Dr. Steven H. Walker (collectively "defendants" or "DARPA"), seeking to enjoin DARPA's program for Robotic Servicing of Geosynchronous Satellites ("RSGS Program" or "Program") under the theory that the Program violates multiple provisions of the 2010 National Space Policy ("NSP"), a presidential policy directive, and therefore violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 701. Compl., [Dkt. No. 1] ¶ 1. Defendants have filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction and for Failure to State a Claim Upon Which Relief May be Granted [Dkt. No. 12], in which defendants contend that the Court lacks subject matter jurisdiction because the complaint runs "afoul of the Supreme Court's 'prohibition on programmatic challenges' that seek 'wholesale improvement of [an agency's programs] by court decree,'" and because "DARPA's determination to conduct the RSGS Program is soundly 'committed to agency discretion by law' within the meaning of 5 U.S.C. § 701(a)(1)," Def. Mem., [Dkt. No.

13] at 2-3 (citations omitted) (alteration in original). In addition, defendants contend that even if the Court had subject matter jurisdiction, plaintiffs' claims must be dismissed under Rule 12(b)(6) because they erroneously contend that the NSP has the force of law. Id. at 3. For the reasons that follow, defendants' motion will be granted.

## I. BACKGROUND

Plaintiffs contend that "DARPA unlawfully intends to waste hundreds of millions of U.S. taxpayer dollars to develop robotic satellite servicing technology for which DARPA has admitted there is no present U.S. Government need and that NASA and the U.S. Private Sector—specifically Plaintiffs—are already developing," and then "give away this technology to a foreign-owned company for that company's sole commercial use." Compl. ¶ 1. DARPA describes its RSGS Program as aimed at implementing robotic servicing of the many government and commercially owned satellites in Geosynchronous Earth Orbit ("GEO"), approximately 22,000 miles above the Earth. Def. Mem. at 1.[1] GEO's orbital period makes it a desirable location for satellites; however, the radiation levels in GEO preclude human space walks and can damage electronics. Id. at 4. There is currently no U.S. entity, private or public, that is able to service GEO-based satellites. Id. at 1. As a result, when satellites in GEO "experience[] failures, malfunctions, schedule delays, coverage gaps, unforeseen maneuvers, and other anomalous events" they cannot be inspected to determine the source of the problem, nor can they be repaired, relocated, or upgraded with new capabilities and installations, therefore becoming prematurely obsolete. Id. at 4-5.

---

[1] As the Department of Defense's ("DoD") research and development agency, DARPA's unique mission is "to make pivotal investments in breakthrough technologies for national security." Def. Mem. at 1.

In 2011, DARPA announced the Phoenix Program to explore potential in-space satellite serving capabilities. Compl. ¶ 18. The initial goal of the Phoenix Program was to utilize DARPA's existing robotic arm technology as well as new technologies "to demonstrate the ability to harvest and re-use valuable components from retired, nonworking GEO satellites." Id. In 2012, DARPA contracted with ATK (plaintiff Orbital ATK's predecessor entity), to modify an existing government owned satellite bus for use in the Phoenix Program demonstration. Id. ¶ 19. "A satellite bus is the infrastructure of a spacecraft, including the propulsion power, operating power, internal communication system and the physical structure, providing locations for the payload (typically space experiments or instruments)." Compl. ¶ 17 n.2. By 2013, DARPA's vision for RSGS technology had changed "from a demonstration mission to a long-term operation with additional capabilities," such as robotic servicing, and DARPA indicated that it no longer needed a repurposed bus, as this vehicle would not be able to support its new objective. Id. ¶ 20.

In May 2015, DARPA circulated a proposal for a consortium of companies to partner with DARPA to pursue real-world servicing capabilities in GEO. Id. ¶ 24. In response to DARPA's proposal, Orbital ATK argued that "satellite life extension[2] was the only existing commercial need sufficient to justify the investment required to support a business case." Id. ¶¶ 24, 26. When Orbital ATK asked DARPA what long-term commitments it had from U.S. government entities to use DARPA's robotic arm technology for servicing GEO satellites, DARPA responded, "there are no existing commitments. We expect them to develop as the RSGS [P]rogram is approved, moves forward toward flight, and becomes a part of various space architectures being developed." Id. ¶¶ 26-27.

---

[2] At the hearing, defendants explained that "life extension" refers to making orbital adjustments.

Meanwhile, ATK's parent company had merged with Orbital Sciences Corporation, a manufacturer of commercial GEO satellites and other spacecraft, to create plaintiff Orbital ATK. Id. ¶¶ 21-22. ATK had been investing in satellite servicing technology for commercial satellites since 2008, and under the new ownership structure Orbital ATK is developing a Mission Extension Vehicle ("MEV"), which will provide a "satellite life extension service"[3] for GEO satellites. Id. ¶ 17. Meanwhile, NASA, which had contracted with ATK since 2004 for the design and development of robotic tools for in-space satellite servicing, has continued to "examine the possibility of on-orbit satellite servicing." Id. ¶¶ 16, 23. In 2015, NASA "conceived of what became the Restore-L program, a project to deploy a robotic spacecraft capable of refueling and servicing an operational satellite;" however, NASA was not focused on GEO, the target of DARPA's RSGS technology, but instead on Low Earth Orbit. Id. ¶ 23.[4] Although plaintiffs identify a "substantial redundancy" between the NASA and DARPA programs, they allege that "[i]n DARPA's case, Orbital ATK's concerns are more acute because of DARPA's stated plan to transfer ownership and commercial use of the technology to a single competitor." Id. ¶¶ 29, 31.

In May 2016, DARPA issued a request for proposals ("RFP") in conjunction with the RSGS Program. Id. ¶ 37. The RFP announced DARPA's intent to partner with a private industry partner to develop and launch a Robotic Servicing Vehicle ("RSV")—an unmanned spacecraft, consisting of both a robotic servicing payload and satellite bus, capable of autonomously servicing, repairing, and repositioning satellites in GEO. Def. Mem. at 1. According to DARPA, the RSGS Program is designed to "(1) inspect satellites experiencing anomalies; (2) assist with

---

[3] In neither of plaintiffs' pleadings did they describe this "satellite life extension service" as addressing all of the functions that DARPA plans to develop, such as correcting mechanical problems and installing upgrade packages on satellites in GEO.

[4] Low Earth Orbit is an altitude between 99 miles and 1,200 miles above the earth and is the site of all manned space stations to date, as well as the majority of satellites. Id. ¶ 23 n.3.

satellite orbital adjustments; (3) correct satellite mechanical problems; and (4) install upgrade payloads onto operating satellites to provide them with new capabilities." Id. at 7. As explained in the RFP, the RSGS Program will have five phases: In the first phase, which is ongoing, DARPA and the U.S. Naval Research Laboratory ("NRL") are working together to develop the "robotic servicing payload"—i.e., the device with a robotic arm capable of repairing the satellites. Id. at 6.[5] Meanwhile a private partner is building a satellite bus capable of carrying the payload. Id. As part of phase one, the NRL has entered into contracts with commercial vendors for components of the robotic servicing payload, including with plaintiff Orbital ATK, which has been contracted to design the circuit boards. Def. Mem. at 6. In the second phase, the private partner will integrate the payload onto the partner-owned bus with support from DARPA. Id. at 6. In the third phase, projected for late 2020 or early 2021, DARPA will launch the RSV into GEO. Id. The fourth phase has DARPA working with its industry partner to demonstrate the capabilities of the RSV in a series of exercises specified by DARPA. Id. In the fifth and final phase, DARPA will transfer ownership of the robotic servicing payload to the private partner, which will continue to own and operate the RSV while offering fee-for-service operations to both U.S. government and commercial GEO satellite operators. Id.

On June 22, 2016, shortly after the RFP was released, Orbital ATK's CEO wrote a letter to DARPA expressing his concern that the RSGS Program violated multiple provisions of the NSP and arguing that it would both unfairly advantage DARPA's private partner and harm investment in Orbital ATK's MEV system. Id. ¶¶ 45-46. DARPA claimed that a response to the

---

[5] DARPA began developing the robotic servicing payload as part of an earlier program through which DARPA contracted with several private companies to develop and demonstrate robotic capabilities for functioning in or near GEO. Id. When the RSGS Program began, DARPA transferred two of these contracts, which are presently ongoing, to the new program. Id.

letter would be inappropriate and declined to meet with Orbital ATK. Id. ¶ 49. Orbital ATK

ultimately attended an informational meeting regarding the RSGS solicitation, allegedly "[i]n an

effort to gain additional information from DARPA, specifically to better understand DARPA's

purported governmental need for the capabilities described in the RSGS [P]rogram." Id. ¶ 51. In

response to written questions about the RSGS Program, DARPA explained that the RSV was not

intended to be used for life extension, but instead for robotic servicing; however, DARPA

indicated that if the private partner wanted to develop life extension capabilities this "would be

complementary to the advanced robotic capabilities DARPA proposes to enable." Id. ¶ 52.

Under the four-step selection process established by the Program Solicitation, interested

parties were to first submit executive summaries of their proposals for the Program. Def. Mem.

at 8. At the second stage, DARPA would invite those parties who met initial eligibility criteria to

submit full proposals. Id. During the third stage, DARPA would invite parties whose full

proposals were most promising to participate in an "oral presentations and negotiations." Id. at 8.

Lastly, DARPA would conduct final evaluations and make an award. Id. at 8-9.

According to plaintiffs, "[a]fter DARPA closed every other avenue of communication,

Orbital ATK had no choice but to reiterate its objections in a counter-proposal to the RSGS

satellite bus RFP," which it submitted on July 5, 2016. Id. ¶ 54-55. Orbital ATK proposed three

alternative approaches that it claimed would save the government money and "achieve DARPA's

stated objectives." Id. ¶ 55. The first approach was for "ground based testing of DARPA's []

robotic arm, followed by transfer of the technology to all interested U.S. companies for fair and

equal commercial development." Id. ¶ 56. The second approach was for DARPA to "fund

development, production, and testing of the RSGS technology as a 'hosted payload' on a

commercial satellite [bus], but not transfer ownership to, or subsidize the launch costs of, a

single private operator." Id. ¶ 57. The third approach was for DARPA to "conduct the RSGS Program for government-only missions but not transfer ownership of the satellite [presumably, plaintiffs meant to write "RSV" or "payload"] to a commercial operator." Id. ¶ 58. As plaintiffs admit, "[n]one of these approaches were contemplated by, let alone did they comply with, DARPA's RFP. Orbital ATK's purpose was not to submit a compliant bid to secure the contract, because it believed that no such contract should be issued." Id. ¶ 59.

On July 14, 2016, DARPA asked Orbital ATK to submit a more detailed proposal. Id. ¶ 60. Orbital submitted "an updated counter-proposal" on September 9, 2016, providing more details regarding Orbital ATK's second approach—"that DARPA change the [P]rogram to one involving a hosted payload without compensation for the launch or transfer of ownership of the payload." Id. ¶ 61. On December 14, 2016, DARPA sent Orbital ATK a letter indicating that its submissions were no longer being considered. Id. ¶ 63. Following its final evaluations, DARPA selected as its industry partner Space Systems/Loral LLC, a wholly owned subsidiary of MacDonald Dettwiler and Associates, a Canadian Corporation. Id. ¶ 64. This relationship is based on an "Other Transaction" agreement ("OT agreement"), a special instrument authorized by Congress for DARPA to flexibly enter into procurement arrangements, for specified purposes, outside the constraints of the Federal Acquisition Regulation and other sources of normally applicable federal procurement law. Id. at 5 & n.3 (citing 10 U.S.C. §§ 2371, 2371(b)).

Plaintiffs allege that the RSGS Program violates five separate provisions of the NSP issued in 2010 by then-President Barack Obama. Compl. ¶ 2. The NSP is a Presidential Policy Directive that sets forth the United States' policy goals in the realm of outer space. Id. The document, which is formatted as a memorandum from the President to cabinet secretaries and other senior officials in the executive branch, begins by stating principles of cooperation with the

international community to which the United States will adhere, proceeds to outline the goals for

the United States' space programs, and closes by offering both intersector and sector guidelines

for departments and agencies. Def. Ex. 14, [Dkt. No. 21-1]. Plaintiffs focus on five particular

provisions in the "Commercial Space Guidelines" section of the NSP, each of which corresponds

to an APA count in the complaint. Compl. ¶¶ 69, 77, 86, 93, 102. That section directs that "[t]o

promote a robust domestic commercial space industry . . . [federal] departments and agencies

shall . . . "

- Purchase and use commercial space capabilities and services to the maximum practical extent when such capabilities and services are available in the marketplace and meet United States Government requirements. [Count I]

- Modify commercial space capabilities and services to meet government requirements when existing commercial capabilities and services do not fully meet these requirements and the potential modification represents a more cost-effective and timely acquisition approach for the government. [Count II]

- Develop governmental space systems only when it is in the national interest and there is no suitable, cost-effective U.S. commercial or, as appropriate, foreign commercial service system that is or will be available. [Count III]

- Refrain from conducting United States Government space activities that preclude, discourage, or compete with U.S. commercial space activities, unless required by national security or public safety. [Count IV]

- Ensure that United States Government space technology and infrastructure are made available for commercial use on a reimbursable, noninterference, and equitable basis to the maximum practical extent. [Count V]

Def. Ex. 14 at 13. By way of relief, plaintiffs request "a declaratory judgment that the DARPA

RSGS project violates the National Space Policy and the Administrative Procedure Act" and

they seek "a permanent injunction prohibiting any further action in furtherance of RSGS

procurement." Compl. at 23.

## II.  DISCUSSION

A. <u>Standard of Review</u>

**Dismissal for Lack of Subject Matter Jurisdiction**

Rule 12(b)(1) permits a defendant to challenge federal court jurisdiction over the subject matter of a complaint. The question of subject matter jurisdiction may be raised by the parties or the court, <u>sua sponte</u>, at any stage of the litigation. <u>Ellenburg v. Spartan Motors Chassis, Inc.</u>, 519 F.3d 192, 196 (4th Cir. 2008). A motion to dismiss for lack of subject matter jurisdiction raises the issue of "whether the court has the competence or authority to hear the case." <u>Davis v. Thompson</u>, 367 F. Supp. 2d 792, 799 (D. Md. 2005). The plaintiff carries the burden of establishing subject matter jurisdiction. <u>Lovern v. Edwards</u>, 190 F.3d 648, 654 (4th Cir. 1999). When the Court addresses the question "on the basis only of motion papers, supporting legal memoranda and the relevant allegations of a complaint, the burden on the plaintiff is simply to make a <u>prima facie</u> showing . . . in order to survive the jurisdictional challenge." <u>Davis</u>, 367 F. Supp. 2d at 799; <u>see also</u> <u>Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.</u>, 334 F.3d 390, 396 (4th Cir. 2003).

**Dismissal for Failure to State a Claim**

In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must assume the facts alleged in the complaint are true and must draw all reasonable inferences in the plaintiff's favor. <u>Burbach Broad. Co. of Del. v. Elkins Radio Corp.</u>, 278 F.3d 401, 406 (4th Cir. 2002). "Judgment should be entered when the pleadings, construing the facts in the light most favorable to the non-moving party, fail to state any cognizable claim for relief, and the matter can, therefore, be decided as a matter of law." <u>O'Ryan v. Dehler Mfg. Co., Inc.</u>, 99 F. Supp. 2d 714, 718 (E.D. Va. 2000). In doing so, a court may consider any document that was "integral to

and explicitly relied on in the complaint[,] . . . [if] the plaintiffs do not challenge its authenticity," Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir. 2004) (internal citation omitted) and matters of public record, of which it may take judicial notice, Sec'y of State for Defence v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

B. Analysis

The questions before the Court are whether, under the terms of the complaint, the Court has subject matter jurisdiction under the APA and whether the NSP has the force of law.

### 1. Subject Matter Jurisdiction

Defendants argue that the Court lacks subject matter jurisdiction over the dispute because the complaint constitutes a challenge to the RSGS Program, which is not an "agency action" challengeable under the APA, and, even if it were, DARPA's determination to pursue the RSGS Program is "committed to agency discretion by law." Def. Mem. at 13. The complaint alleges that "[b]ecause this action arises under the federal Administrative Procedure Act [], 5 U.S.C. § 706, this Court has federal question jurisdiction under 28 U.S.C. § 1331." Compl. ¶ 8. Stated more accurately, 28 U.S.C. § 1331 grants the district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States," and although § 1331 does not waive the government's sovereign immunity, the APA contains a limited waiver of immunity. City of Albuquerque v. U.S. Dep't of Interior, 379 F.3d 901, 906-07 (10th Cir. 1984); see also Heckler v. Chaney, 470 U.S. 821, 825 (1985) ("Jurisdiction was grounded in the general federal-question jurisdiction statute, 28 U.S.C. § 1331, and review of the agency action

was sought under the judicial review provisions of the APA, 5 U.S.C. §§ 701-706."). The relevant section, 5 U.S.C. § 702, states, "A person suffering legal wrong because of agency action . . . is entitled to judicial review thereof. An action . . . seeking relief other than money damages . . . shall not be dismissed . . . on the ground that it is against the United States." If the complaint does not challenge "agency action," a court lacks subject matter jurisdiction over the claim. Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 891 (1990). The APA also expressly excludes from its ambit "agency action [that] is committed to agency discretion by law." 5 U.S.C. § 701(a)(2); I.C.C. v. Bhd. of Locomotive Eng'rs, 482 U.S. 270, 282 (1987) (explaining that the unavailability of judicial review in this circumstance represents a "limitation to the general grant of jurisdiction contained in 28 U.S.C. § 1331").

Congress has defined the term "agency action" to mean "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). As the Fourth Circuit has explained, "The term 'action' as used in the APA is a term of art that does not include all conduct such as, for example, constructing a building, operating a program, or performing a contract." Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs, 714 F.3d 186, 193–94 (4th Cir. 2013). More specifically, the Supreme Court has expressly excluded claims requesting "wholesale improvement of [a] program" from judicial review because a program is not a discrete agency action. Lujan , 497 U.S. at 891. The Lujan plaintiffs challenged the Bureau of Land Management's ("BLM") "so-called 'land withdrawal review program,'" but the Court found that this term "[did] does not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations" but to "the continuing (and thus constantly changing) operations of the BLM in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans." Id. at 890.

This ongoing operation, the Court concluded was "no more an identifiable 'agency action'—much less a 'final agency action'—than a 'weapons procurement program' of the Department of Defense or a 'drug interdiction program' of the Drug Enforcement Administration." Id. As the Supreme Court has subsequently elaborated, the bar against this "kind of broad programmatic attack" is rooted in the definition of "agency action," which by its terms requires that the action be "discrete"—i.e., an "agency rule, order, license, sanction [or] relief." Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 62-64 (2004). This limitation serves to "protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." Id. at 66.

Defendants argue that plaintiffs' challenge to DARPA's RSGS Program is the very sort of programmatic challenge foreclosed by Lujan. Def. Mem. at 12. As defendants explain, the RSGS Program is not a discrete agency action but a multi-phase program, including, for example, multiple contracts by both DARPA and the NRL "with various aerospace companies—including Orbital ATK itself—to procure component parts and services" and "[DARPA providing] funding [for] research and development activities in the areas of on-orbit robotic servicing, including but not limited to through a grant to Western Michigan University." Id. at 12-13.

Plaintiffs respond to that argument by ignoring the language in their complaint, which clearly challenges the entire RSGS Program. Compl. ¶ 1 ("Plaintiffs are entitled to declaratory relief and an injunction to prevent Defendant[s] from taking any action in furtherance of this unlawful program." (emphasis added)). Instead, plaintiffs oppose defendants' Motion to Dismiss by focusing on DARPA's award of the OT agreement, which they describe as a final agency

action subject to APA review. Pl. Opp. at 8.[6] Despite devoting four-pages to this argument, plaintiffs fail to cite to a single passage of the complaint supporting the contention that their challenge is limited to "[t]he specific decision to enter the OT." Pl. Opp. at 12. This is unsurprising because the complaint contains no such language. The only reference to a consummated contract is the statement that "[u]pon information and belief, on February 6, 2017, DARPA announced that it has reached a final decision, and Space Systems/Loral LLC has been selected as the commercial [partner]." Compl. ¶ 64. Instead, the complaint consistently focuses on the RSGS Program. The first paragraph of the complaint alleges that "DARPA's [P]rogram is in direct violation of multiple provisions of the 2010 National Space Policy and thus constitutes a violation of the Administrative Procedure Act." Compl. ¶ 1 (emphasis added). In the remainder of the seven-paragraph introduction, plaintiffs repeatedly reference "DARPA's [P]rogram," id. ¶¶ 5, 6, DARPA's "approach," id. ¶ 7, and DARPA's "misguided, wasteful and unnecessary project," id., but never once reference the OT agreement. Similarly, all five sections outlining the various counts conclude that "DARPA's decision to pursue the RSGS [P]rogram as constituted in direct violation of the National Space [P]olicy is arbitrary, capricious, and not in accordance with law." Id. ¶¶ 73, 82, 89, 98, 106 (emphasis added). Most tellingly of all, the relief requested is "a declaratory judgment that the DARPA RSGS project violates the National Space Policy"

---

[6] Based on plaintiffs' representation that they challenge the award of the OT agreement itself, defendants argue that plaintiffs lack standing to bring what is in effect a bid protest "either because their Program Proposal was not sufficiently competitive, or—on their own theory— because they are not actual bidders for this award at all." Def. Reply at 7. In their surreply, plaintiffs state that they "were not bidders on the RSGS Program" and argue that the complaint is not a bid protest because "[p]laintiffs do not allege that that they should have received the award, nor do they object to the government pursuing robotic satellite servicing." Surreply at 1. Because the complaint does not actually attack the OT agreement, the Court will focus exclusively on the APA framework as it pertains to the RSGS Program and not consider defendants' standing arguments as they relate to bid protests.

and "a permanent injunction prohibiting any further action in furtherance of the <u>RSGS</u> <u>procurement</u>," not actions in furtherance of the OT agreement. Compl. at 23 (emphases added).

Plaintiffs are not the first litigants to attempt to save a programmatic challenge by pointing to one or more component contracts or agreements. In <u>Lujan</u>, the Court concluded that, notwithstanding the complaint's attack on numerous land sale orders, the challenge to the "land withdrawal review program" was nonjusticiable because it constituted a programmatic challenge. 497 U.S. at 892-93. Similarly, in <u>Sierra Club v. Peterson</u>, the Fifth Circuit held that the Sierra Club could not "challenge an entire program by simply identifying specific allegedly improper final agency actions within that program." 228 F.3d 559, 567 (5th Cir. 2000). As these cases demonstrate, the mere fact that the OT agreement is a part, perhaps even an integral part, of the RSGS Program, is not enough to convert plaintiffs' programmatic challenge into a justiciable request for judicial review of agency action. Rather, because the RSGS Program consists of multiple interrelated actions, of which consummating a private partner relationship through the OT agreement is just one, the challenge is not justiciable "simply because one of [the actions] that is ripe for review adversely affects" plaintiffs. <u>Lujan</u>, 497 U.S. at 893.[7] And, contrary to plaintiffs' argument, their complaint does not simply challenge one element of DARPA's action. Surreply at 1-2. Rather, the five-count complaint explicitly challenges DARPA's development of technology that plaintiffs claim it should purchase from the commercial sector (Counts I, II, and

---

[7] This conclusion does not undermine a litigant's ability to invoke the APA to challenge a contract that exceeds the bounds of an agency's authority. See <u>Exec. Bus. Media, Inc. v. U.S. Dep't of Def.</u>, 3 F.3d 759, 760 (4th Cir. 1993) (holding that a settlement contract entered into by the Attorney General was judicially reviewable under the APA where the claim alleged that the settlement "fail[ed] to comply with competitive bidding procedures"); <u>see also</u> <u>United States v. Carpenter</u>, 526 F.3d 1237, 1242 (9th Cir. 2008) (upholding that plaintiff's use of the APA to challenge a settlement contract signed by the Attorney General as a violation of the National Environmental Policy Act, 42 U.S.C. § 4332, the Federal Land Policy and Management Act, 43 U.S.C. § 1701, and Forest Service regulations, 36 C.F.R. pt. 251).

III). Because the complaint is an attack on the RSGS Program, this Court does not have subject matter jurisdiction and on this ground alone defendants' motion must be granted.[8]

## 2. Force of Law

Even if plaintiffs' complaint were not construed as a challenge to the RSGS Program, to prevail on a challenge to the OT agreement plaintiffs would still need to establish that the NSP supplies the "law" against which to measure the agency action. See 5 U.S.C. § 706(2)(A) (authorizing courts to "set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law"). On this score, defendants argue that "the terms of the NSP plainly indicate that this document is simply a policy directive from the President to his subordinates—and as such, cannot supply the 'law' against which the APA would otherwise grant this Court authority to set aside agency action." Def. Mem. at 23. Defendants do not dispute that "[a] Presidential order may have the force and effect of law;" rather, they emphasize that such orders are only enforceable under the APA "when [they are] issued pursuant to [either (1)] a statutory mandate[,] or [(2)] a delegation from Congress of lawmaking authority." Id. at 25 (citing U.S. Dep't of Health & Human Servs. v. Fed. Labor Relations Auth., 844 F.2d 1087, 1095 (4th Cir. 1987) (en banc)) (first alteration added). Stated differently, in the context of the APA, the word "law" refers to lawmaking authority under Article I of the Constitution, not the president's executive authority under Article II, which

---

[8] Defendants also attack jurisdiction on the basis that DARPA's pursuit of the RSGS Program is "committed to agency discretion by law" and is therefore unreviewable under 5 U.S.C. § 701(a)(2). Def. Mem. at 13. Defendants' first discretion argument, which treats the complaint as a challenge to a lump sum appropriation, is, as plaintiff explains, Pl. Opp. at 26, a mischaracterization of the complaint; defendants appear to have conceded this argument as it is not addressed in their reply. Their second argument is that, even assuming the NSP has the force of law, it does not provide a meaningful standard. Def. Mem. at 17. This issue is vigorously contested; however, because defendants deny that the NSP has the force of law, the Court must first address the threshold question regarding the legal force of the NSP.

admittedly can have legal effect. See U.S. Dep't of Health & Human Servs., 844 F.2d at 1095

("The executive branch . . . simply has no power to make the law; that power rests exclusively

with Congress." (citing Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587-88 (1952)).

In keeping with this distinction, some presidential orders are merely "internal directives"

"intended for the internal management of the President's cabinet" and "should not [be]

enforce[d]" by courts. Chai v. Carroll, 48 F.3d 1331, 1339 (4th Cir. 1995). Plaintiffs deny that

the NSP is merely a managerial tool; instead they insist that "the 2010 NSP is the latest in a long

line of [Executive Orders] regarding space policy that a) are based on express grants of authority

from Congress and b) have been ratified by Congressional action." Pl. Opp. at 13-14.

At the outset of this analysis, a brief discussion of terminology is necessary. Plaintiffs

refer to the NSP as "an Executive Order," Compl. ¶ 2, but it is in fact a "Presidential Policy

Directive," [Dkt. 21-1] at 1. Defendants "do not dispute that Presidential Policy Directives such

as the NSP are a form of Executive Order, such that—like any other Executive Orders, and

depending on the source from which they derive their authority—these directives can have the

force of law." Def. Mem. at 24 (emphases and quotation marks omitted). Although the Court

agrees that, under certain circumstances, a Presidential Policy Directive could have the force of

law,[9] treating it as a form of Executive Order elides a number of potentially relevant distinctions.

See Erica Newland, Note, Executive Orders in Court, 124 Yale. L. J. 2026, 2045 (2015)

(explaining that presidents have various tools—including "presidential findings, national security

instruments, presidential directives, presidential proclamations, presidential memoranda, and

---

[9] See Legal Effectiveness of a Presidential Directive, as Compared to an Executive Order, 24 Op.
O.L.C. 29, 29 (2000), 2000 WL 33155723, * 1 (opining that "it is the substance of a presidential
determination or directive that is controlling and not whether the document is styled in a
particular manner").

executive orders, among others—that, under the appropriate circumstances, have the force and effect of law").

Since the Constitution's ratification, presidents have "issued directives establishing new policy, decreeing the commencement or cessation of some action, or ordaining that notice be given to some declaration." Harold C. Relyea, Cong. Research Serv., 98-611 GOV, Presidential Directives: Background and Overview i (2008). These instruments, which can most broadly be described as "presidential directives," have taken many forms ranging in formality from oral directives to Executive Orders published in the Federal Register. Id. "[M]ost of these instruments establish policy" and "[w]hether [they] have the force of law depends upon such factors as the President's authority to issue them, their conflict with constitutional or statutory provisions, and their promulgation in accordance with prescribed procedure." Id. at 2. Executive Orders date back to President George Washington, and over time have become increasingly formal. Id. at 5. Since 1907, the Department of State has assigned identification numbers to all Executive Orders (e.g., E.O. 11,030) and it maintains a repository for these instruments. Id. In 1935, Congress passed the Federal Register Act, which requires that "all Presidential proclamations and Executive Orders, except those not having general applicability and legal effect or effective only against Federal agencies or persons in their capacity as officers, agents, or employees thereof" must be published in the Federal Register. See 44 U.S.C. § 1505(a)(1). The statute also requires that "documents or classes of documents that the President may determine from time to time have general applicability and legal effect" be reproduced in the Federal Register. Id. at §1505(a)(2). National security instruments, which are policy papers prepared by the President in conjunction with the National Security Council, are a separate subset of presidential directives. Relyea, supra, at 8-9. These documents are not published in the Federal Register; rather, most

have been classified. Id. During the Obama administration, directives that were used to promulgate presidential decisions on national security matters were designated Presidential Policy Directives ("PPDs") and Presidential Study Directives ("PSDs"). See Barack Obama, Presidential Policy Directive—1 "Organization of the National Security Council System" (Feb. 13, 2009), available at https://fas.org/irp/offdocs/ppd/ppd-1.pdf (last visited June 21, 2017).

Upon reviewing the NSP, which is designated PPD-4, the inescapable conclusion is that it represents a series of internal management directives and does not have the force of law. Def. Ex. 14, [Dkt. No. 21-1] at 1. The NSP is a memorandum addressed to 23 executive branch officials, including the Vice President, various cabinet secretaries, the Chairman of the Joint Chiefs of Staff, and the Administrator for NASA. Id. The opening line reads, "This Presidential Policy Directive (PPD) establishes overarching national policy that governs the conduct of U.S. space activities." Id. Although the memorandum identifies a number of presidential directives that it supersedes, it does not cite the authority under which it is issued. The section headings range from "Goals" to "Intersector Guidelines" and "Sector Guidelines" and the sections are developed in bulleted lists. Id. at 4-5, 13. The 24-page document concludes with a four-page appendix enumerating specific "Implementation Actions" for individual executive officials to complete by stated deadlines. Id. at 21-24. The five provisions relied upon by plaintiffs appear in a section entitled "Commercial Space Guidelines." Id. at 13-14. Beyond those provisions already discussed, the NSP includes such guidance as "[e]ncourage the purchase and use of U.S. commercial space services in international cooperative arrangements" and "[a]ctively promote the export of U.S. commercially developed and available space goods and services . . . for use in foreign markets . . . ." Id. at 14. In addition, the NSP was not published in the Federal Register, either in full or in part (some sections of the NSP are classified).

Based on these factors, the Court concludes that the NSP is a directive aimed at the internal management of the executive branch and was not promulgated in reliance on lawmaking authority delegated from Congress. As such, it does not have the force of law and does not provide a basis for bringing an APA claim in this court. Chai, 48 F.3d at 1339; In re Surface Min. Regulation Litig., 627 F.2d 1346, 1357 (D.C. Cir. 1980) ("[E]xecutive orders without specific foundation in congressional action are not judicially enforceable in private civil suits."); Indep. Meat Packers Ass'n v. Butz, 526 F.2d 228, 235 (8th Cir. 1975) ("Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587-89 (1952) completely refutes the claim that the President may act as a lawmaker in the absence of a delegation of authority or mandate from Congress."). Rather, like many presidential directives before it, the NSP "was intended primarily as a managerial tool for implementing the President's personal [] policies and not as a legal framework enforceable by private civil action." Indep. Meat Packers Ass'n, 526 F.2d at 235–36. Because the NSP is an internal management tool, "[w]hether an agency [] is following the directives of the President is not for [the Court] to determine." U.S. Dep't of Health & Human Servs., 844 F.2d at 1095. This is not to say that a PPD can never have the force of law; however, on the facts before the Court there is no basis for presuming that the NSP has the legal force equivalent to a statute, particularly in the absence of a clear invocation of congressionally delegated lawmaking authority.

Despite the total absence of indicia in the NSP that either the document as a whole or the section entitled "Commercial Space Guidelines" creates rights and obligations enforceable by third parties, plaintiffs insist that it has the force of law because there are "numerous statutory foundations for the NSP." Pl. Opp. at 13. This argument invites the Court to ignore the threshold issue of whether the President intended for the NSP to have the force of law and consider merely

whether he could have done so. See Sea-Land Serv., Inc. v. I.C.C., 738 F.2d 1311, 1314 (D.C. Cir. 1984) ("The 'law' at issue in this instance is an Executive Order promulgated by the President, and it is to his intent that we must turn for guidance."); Newland, supra, at 2069 (explaining that the "guiding principle when interpreting executive orders—including Article I executive orders—has generally been to give effect to presidential intent" (emphasis omitted)). Even if the President had intended for the NSP to have the force of a statute, the generalized congressional provisions to which plaintiffs cite, which make broad statements about space policy and programs, fall far short of the "specific statutory foundation" a presidential directive must have to be "given the effect of a congressional statute." City of Albuquerque, 379 F.3d at 913. For example, plaintiffs cite to the statue establishing NASA, which states that NASA's administrator operates "under the supervision and direction of the President." 51 U.S.C. § 20111(a). But this is merely a recognition of the President's inherent authority to direct Executive Branch officials, and hardly amounts to a delegation of Congress's lawmaking authority. In addition, because DARPA is part of the DoD, neither the President's authority to supervise NASA nor the various other statutes directed at NASA to which plaintiffs cite[10] have any bearing on his authority vis-à-vis DARPA.

---

[10] See National Aeronautics and Space Administration Transition Authorization Act of 2017, Pub. L. 115-10, 131 Stat. 18 (requiring NASA to develop a plan in which it identifies its facility and infrastructure needs); 2010 NASA Authorization Act, Pub. L. No. 111-267, § 204, 124 Stat. 2805, 2813 (directing the NASA Administrator to conduct a review, relying on, among other things "any existing statement of space policy issued by the President"); 2008 NASA Authorization Act, Pub. L. No. 110-422 § 1114, 112 Stat. 4779 (stating that "the President should elevate the importance of space and aeronautics within the Executive Office of the President by organizing the interagency focus on space and aeronautics matters in as effective a manner as possible, such as by means of the National Space Council authorized by section 501 of the National Aeronautics and Space Administration Authorization Act, Fiscal Year 1989 (42 U.S.C. § 2471) or other appropriate mechanisms.").

Similarly, the statement that "[i]t is the policy of the United States for the President to undertake actions appropriate to ensure, to the maximum extent practicable, that the United States has the capabilities necessary to launch and insert United States national security payloads into space whenever such payloads are needed in space," 10 U.S.C. § 2273(a), contains no delegation of authority but merely describes the "policy of the United States." It also says nothing of the broad array of space-related activities addressed in the NSP. Further, although plaintiffs make much of the fact that in October 2010, four months after the NSP was issued, Congress directed the President to "develop a national policy to guide the space technology development programs of the United States through 2020," 42 U.S.C. § 18404(a), and has since instructed NASA to develop an infrastructure plan that "is consistent with the national strategic direction set forth in—(1) the National Space Policy, National Aeronautics and Space Administration Transition Authorization Act of 2017, Pub. L. 115-10, § 837(c)(3)(C)(i), 131 Stat. 18," neither of these provisions constitute a delegation of lawmaking authority. Rather, they simply reaffirm the President's policymaking role directing the operations of the United States' space-oriented agencies.

The inadequacy of these statutes as a basis for finding that the NSP has the force of law is reinforced by the contrast between the generality of the statutes cited by plaintiffs and the specific statutory foundations that have been recognized as providing the force of law for presidential directives in other cases. Compare City of Albuquerque, 379 F.3d at 913 (recognizing the legal force of an Executive Order that cited 40 U.S.C. § 486(a), which delegated to the President the authority to "prescribe such policies and directives . . . as he shall deem necessary to effectuate the provisions of said Act"); Nat'l Broiler Council, Inc. v. Fed. Labor Relations Council, 382 F. Supp. 322, 325 (E.D. Va. 1974) (recognizing the enforceability of an

Executive Order that cited 5 U.S.C. §§ 3301, 7301, which provided that the President "may prescribe regulations for" enumerated civil service issues); Knowledge Connections, Inc. v. United States, 79 Fed. Cl. 750, 758 (2007), dismissed, 321 F. App'x 948 (Fed. Cir. 2008) (enforcing an Executive Order that explicitly referenced the Small Business Act, 15 U.S.C. § 644(g), which required the President to establish and implement a minimum contracting goal); with Indep. Meat Packers Ass'n, 526 F.2d at 235 (declining to enforce an Executive Order that cited "no specific source of authority other than the 'Constitution and laws of the United States'").

Indeed, although every president since President Dwight Eisenhower has issued a national space policy directive, Pl. Opp. at 14, plaintiffs cannot point to a single case where one of these policies was actually found to have the force of law. The one case plaintiffs cite for this proposition, Am. Satellite Co. v. United States, 26 Cl. Ct. 146 (1992), judgment rev'd in part, vacated in part, 998 F.2d 950 (Fed. Cir. 1993), did not involve an overarching national space policy and did not identify a congressional delegation of lawmaking authority to the President. In that case, American Satellite Company ("ASC") brought suit against the United States, arguing that NASA was legally obligated to launch one of the company's satellites on a government shuttle. Id. at 147. In 1984, NASA had signed a contract agreeing to launch two ASC satellites. Id. at 148. The first launch took place as scheduled but, following the fiery explosion of the Space Shuttle Challenger in January 1986, which killed all seven crew members, President Ronald Reagan issued a directive announcing that the United States was withdrawing from the commercial launch business. As a result, ASC's second satellite launch was removed from NASA's list of scheduled launches. Id. at 148-49. The issue before the Court of Claims was whether the President's directive effectively modified the terms of the contract, which expressly

stated that "the parties' obligations would continually be adapted to changing law and policy." Id. at 153. Although ASC argued that the President lacked the authority, either under the Constitution or statute, to modify NASA's launch priorities, after surveying the history of U.S. space policy and relevant congressional statutes, the court found that "there [had] been a systematic practice of Presidential initiative in the area of the nation's space policy," which was "consistent with the President's powers under Article II of the Constitution, and has been tacitly, if not expressly acknowledged by Congress," and pursuant to those powers the presidential directive modified the terms of the contract. Id. at 157; see also id. at 154 ("Congress has acquiesced to a consistent pattern of Presidential policy-making for the nation's space program.").

Plaintiffs are mistaken in reading Am. Satellite Co. as a finding that the presidential directive had the "force of law." Instead, the court held that the directive had legal effect by modifying a contract through Article II authority, not through the lawmaking authority reserved to Congress under Article I. As for acquiescence, as Justice Frankfurter observed in Youngstown, "a systematic, unbroken, executive practice, long pursued to the knowledge of Congress and never before questioned . . . may be treated as a gloss on 'Executive Power' vested in the President by § 1 of Art. II." 343 U.S. at 610-11 (emphasis added). Therefore, contrary to plaintiffs' suggestion, congressional acquiescence is merely a gloss on Article II authority and does not give a directive issued under Article II the force of law associated with Article I.

In short, the structure and content of the NSP and the statutes and precedents cited by plaintiffs do not demonstrate that the NSP carries the force of law and as such it cannot support a claim for relief under the APA. 5 U.S.C. §§ 702, 706.

### III. CONCLUSION

For the reasons stated above, defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction and for Failure to State a Claim Upon Which Relief May be Granted [Dkt. No. 11] will be granted by an appropriate Order to be issued with this Memorandum Opinion and plaintiffs' complaint will be dismissed without prejudice.

Entered this 12 day of July, 2017.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge